Noyes v. Moccia, et al.            CV-98-019-M    06/24/99
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Terri Noyes,
      Plaintiff

      v.                                    Civil No. 98-19-M

Paul C. Moccia,
   in his individual and
   official capacity,
Alton School Board, and
School Administrative Unit #51,
      Defendants


                        **O R D E R**


      Plaintiff Terri Noyes brought this action[1] under 42 U.S.C. §

1983 and New Hampshire law against defendants Paul Moccia,

Superintendent of Schools for School Administrative Unit ("SAU")

#51, the Alton School Board (the "school board"), and SAU #51

after she was fired from her position with Alton Central School

for falsifying a time card.  Plaintiff alleges that the manner in

which defendants effected her termination and interfered with her

subsequent efforts to obtain different employment violated her

Fourteenth Amendment rights to procedural and substantive due

process (Counts I and II of the amended complaint), constituted

defamation (Count III) and intentional interference with

contractual relations (Count IV), and violated N.H. Rev. Stat.

Ann. § 91-A (Count VI).[2]  Defendants move for summary judgment.

---

      [1]Suit was originally filed in state court and later removed
to this court pursuant to 28 U.S.C. § 1441.

      [2]Plaintiff's amended complaint also included a claim for
breach of contract (Count V).  Plaintiff voluntarily dismissed

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. Id. (quoting Anderson v.

that claim in her objection to defendants' motion for summary judgment.

2

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

Plaintiff was employed as a Special Needs Aide at Alton Central School for the 1995-96 fiscal year.  On June 6, 1996, plaintiff attended a Class Day assembly, in which her two sons and daughter participated.  The assembly was held in the school building in which plaintiff worked.  Before attending the assembly, plaintiff made arrangements to have her work assignments covered and obtained at least tacit approval from her immediate supervisor.[3]  Plaintiff recorded the time spent at the assembly on her time card as time worked.  Other staff members who attended the assembly also recorded their time there as payable, and the evidence viewed in the light most favorable to plaintiff suggests that it was a common, and even approved,

---

[3]In her deposition, plaintiff's supervisor initially testified that plaintiff had her permission to attend the assembly.  (Fuller Dep. at 6.)  She later noted on the correction and signature page: "I am not sure if I was the person to give [plaintiff] 'permission[.]'  She said she was going & was covered."

3

custom or practice for staff to record such time on time cards and make it up later.

A school board member who saw plaintiff at the assembly checked her time records and discovered that plaintiff had recorded the time as worked. At a meeting on June 24, 1996, the school board voted in nonpublic session to terminate plaintiff's employment. The minutes of the meeting stated that "the Board voted to terminate a support staff member for falsifying his/her time card." (Ex. 7 to Pike Aff. at 7.) Plaintiff received no prior notice that any action regarding her employment would be considered at the meeting.

By letter dated June 26, 1996, Defendant Moccia informed plaintiff that the school board had voted to terminate her with two weeks notice. No reason was given in the letter. After obtaining a copy of the June 24, 1996, minutes, plaintiff wrote to the chairman of the school board requesting a nonpublic hearing at the school board's next-scheduled meeting on July 22, 1996. Neither the Chairman nor board responded. Plaintiff did not discover that her request had (presumably) been denied until she obtained a copy of the upcoming meeting agenda on the morning of July 22, 1996. She attended the meeting anyway, and, at the public input session, read a prepared statement objecting to the unreasonableness of her termination and requesting reinstatement. The school board took no action.

Following correspondence from plaintiff's legal counsel, the school board allowed plaintiff to make a "presentation" at a

4

nonpublic meeting of the board. The board made clear, however, that her appearance was to make a presentation, and was not a "hearing." After listening to plaintiff's presentation without comment, the board declined to reconsider its earlier termination decision.

Following her termination, plaintiff applied for a Postmaster Relief position at the Alton Post Office. The application asked whether plaintiff had "ever been fired from any job for any reason." (Ex. 1 to Pl.'s Dep.) Plaintiff consulted the Postmaster of the Alton Post Office as to how she should answer. After hearing plaintiff's account of her termination, the Postmaster advised that she could answer no, which she did. She was hired for the position.

Sometime thereafter, the personnel office of Alton Central School received a background investigation request form regarding plaintiff's suitability for employment as Postmaster Relief. Defendant Moccia completed the form, indicating that the plaintiff "was discharged for falsifying her time cards. This was one incident." (Pl.'s Ex. 16.) Defendant Moccia later had two telephone conversations with a representative from the United States Postal Service ("USPS") regarding plaintiff's termination.

By letter dated May 14, 1997, plaintiff was notified that she was deemed disqualified for employment with the USPS because she made false statements on her employment application. Specifically, the letter noted that plaintiff's application stated that she had never been fired from a job, while a

background check revealed that she had been terminated from her employment with the Alton School District for falsifying time cards. Plaintiff attempted to explain her situation, but the USPS determined that she made false statements in her application.

Discussion

Defendants first argue that SAU #51 is entitled to summary judgment on all of plaintiff's claims because the Alton School District, not SAU #51, was plaintiff's employer. Plaintiff notes that each of her employment contracts was on SAU #51 letterhead and signed by the SAU #51 superintendent. Her 1995-1996 letter of intent to employ, however, also states that she is "appointed as a Special Needs Aide for the 1995-96 fiscal year for the Alton School District" and indicates that she would receive benefits "As Per School Board Policy." (Pl's Ex. 1.) Alton School District Policy GD provides that "[t]he School Board shall create, through the adoption of a budget or specific vote, all support staff positions." (Pl's Ex. 18.) In addition, under New Hampshire law, SAUs themselves appear to have limited personnel:

> Superintendents, assistant superintendents, business administrators, teacher consultants, and the regularly employed office personnel of the school administrative unit office shall be deemed employees of the school administrative unit for the purposes of payment of salaries and contributions to the employee's retirement system of the state of New Hampshire and workers' compensation.

N.H. Rev. Stat. Ann. § 194-C:9 (Supp. 1998) (effective August 9, 1996); N.H. Rev. Stat. Ann. § 189:47 (1989) (repealed effective

6

August 9, 1996) (providing the same at the time of plaintiff's employment). The court finds that plaintiff has failed to raise a genuine issue of material fact as to the identity of her employer.

Plaintiff's claims against SAU #51, however, are not based on its disputed status as her employer. Plaintiff instead alleges that SAU #51 is responsible for the actions of Defendant Moccia, who undisputedly is its employee. Thus, it is the relationship between SAU #51 and Defendant Moccia that is at issue.

With regard to her constitutional claims, plaintiff argues that because Defendant Moccia had final policy-making authority with respect to personnel decisions, SAU #51 is liable for his conduct. See Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion) (holding that "municipal liability under § 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question"). Plaintiff points to Alton School District Policy GD which provides that the "Superintendent shall appoint, supervise and dismiss, when necessary, all support staff personnel." (Pl.'s Ex. 18.) She alleges in her amended complaint that Defendant Moccia "delegated his policy-making authorit[y] to the Alton School Board, and participated and acquiesced in the decision of the Alton School Board to intentionally and

7

recklessly deprive [plaintiff] of her conditionally protected property interest in her employment." (Compl. at ¶ 46.)

Plaintiff's theory, however, is supported by neither fact nor the law. The record shows that the school board was acting on its own initiative. In answer to plaintiff's interrogatories, the school board listed only school board members as participants in the decision to terminate plaintiff and stated that "[i]t is the understanding of the School Board members who have answered these interrogatories that under the RSAs, the Alton School Board has final authority to dismiss employees." (Pl.'s Ex. 22 at 5.) Although the school board did not identify the statutory authority relied upon, the court notes that N.H. Rev. Stat. Ann. § 189:31 (Supp. 1998) provides

> Superintendents shall direct and supervise the work of teachers, and for cause may remove a teacher or other employee of the district. The person so removed shall continue as an employee of the district unless discharged by the local school board but may not return to the classroom or undertake to perform the duties of such person's position unless reinstated by the superintendent.

Thus, it appears that Defendant Moccia neither had, nor purported to exercise, final policy-making authority in the decision to terminate plaintiff.

With regard to Defendant Moccia completing the background investigation form for the USPS, his testimony indicates that there was no SAU #51 or School District policy directing him to respond. (Moccia Dep. at 61.) He stated that he followed his own procedure and "did what [he] thought was right." Id. That he exercised discretion in deciding to disclose the reason for

8

plaintiff's termination is not sufficient to impose liability on SAU #51. "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability," City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) (plurality opinion), which does not exist under § 1983, Pembaur, 475 U.S. at 478-79. The relevant question is whether he had the authority to establish final policy for responding to prospective employer inquiries concerning former employees. This is a question of state law. Praprotnik, 485 U.S. at 124 (plurality opinion).

The court finds that Defendant Moccia did not have such authority. New Hampshire Administrative Rule Ed. 303.01(a) provides in part that it is the school board's duty to "[a]dopt policies necessary and desirable to control and effectuate the recruitment, employment, evaluation and dismissal of teachers and other employees and [it] may delegate authority to the superintendent of schools to carry out the provisions of such policies." SAU #51 Policy CB, in turn, states that "[t]he administration of the school system in all its aspects shall be delegated to the Superintendent who shall carry out his administrative functions in accordance with the policies adopted by the Board."[4] (Pl's Ex. 3.) The superintendent has "general supervision of the public schools and of all the personnel and departments of the school system under the Board's policies and

---

[4]It is not entirely clear whether the reference to the "Board" is to the school board or the SAU board.

9

is accountable to the Board." Id. The court concludes that the superintendent administers the policies of the school board (and likely the SAU board as well) but is not authorized to make final policy concerning employment matters, such as handling inquiries from prospective employers regarding the school's former employees. Accordingly, SAU #51 cannot be held liable under 42 U.S.C. § 1983 for Defendant Moccia's alleged constitutional violations.

Plaintiff also argues, however, that SAU #51 could be found liable, under the doctrine of respondeat superior, for Defendant Moccia's state law violations. Defendants have not briefed the issue. While count II of plaintiff's complaint is dismissed, SAU #51 is not dismissed as a party.

Plaintiff originally alleged that the circumstances of her termination deprived her of both property and liberty in violation of the Fourteenth Amendment, but now abandons her claim to a constitutionally-protected property interest, and proceeds solely on the basis of an asserted liberty interest.

Summarizing Supreme Court precedent, the First Circuit has noted:

> [A] public employer's failure to afford a name-clearing hearing for a discharged employee is cognizable under section 1983 as a deprivation of a liberty interest only if (1) the dismissal is grounded on charges which stigmatize the employee and (2) the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination. Moreover, the stigmatization must occur in the course of the termination of employment.

10

Brennan v. Hendrigan, 888 F.2d 189, 196 (1st Cir. 1989) (citations and internal quotation marks omitted).

Defendants argue that they are entitled to summary judgment because they did not publicize (or "disseminate") the reasons for plaintiff's termination. See Bishop v. Wood, 426 U.S. 341, 348 (1976) (constitutionally-protected liberty interest not implicated by "the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge"). Specifically, they argue that the minutes of the June 24, 1996, meeting did not identify the plaintiff by name, and that it was plaintiff who publicly disclosed that she was the discharged employee, and who publicly spoke about her termination at the July 22, 1996, school board meeting, as well as in a July 31, 1996, newspaper article. The defendants compare this case to Sullivan v. School Bd. of Pinellas County, 773 F.2d 1182, 1187 (11th Cir 1985), in which the plaintiff "publicly announced her nonrenewal, brought her nonrenewal to the attention of the media, demanded a written statement of the reasons for her nonrenewal, and instigated the written presentation to the school board and thus to the public."

Plaintiff, however, contends that defendants made the first public disclosure of the reasons for her termination in the minutes of the June 24, 1996, school board meeting.[5] Plaintiff argues that the defamatory statement need not name her, so long

_____

[5]The minutes are a public record. See N.H. Rev. Stat. Ann. § 91-A:3, III (Supp. 1998).

as a reasonable reader would understand the statement to refer to her.  Cf. Restatement (Second) Torts § 564 cmt. b. (1977) (defamation law).  She asserts that "[h]ere, it was reasonably understood from the defendants' publication that [plaintiff] was the support staff [member] who had been terminated for falsifying a time card."  (Pl.'s Br. at 10.)

The question, then, is whether a stigmatizing statement that does not identify the plaintiff by name can nevertheless qualify as sufficient public disclosure to trigger a protected liberty interest.  Precedent reveals some doubt.  See Dziewior v. City of Marengo, 715 F. Supp. 1416, 1424 (N.D. Ill. 1989) ("observ[ing] that the failure to mention the plaintiff's name in the published minutes casts substantial doubt on the merits of the plaintiff's liberty claim").  However, the leading case for the proposition that failure to name a plaintiff can be fatal to her claim actually held that dismissal would be required where the plaintiffs failed to "alleg[e] that the press release, even without naming any of the plaintiffs, would somehow have conveyed their identity to readers who knew them."  Clark v. Maurer, 824 F.2d 565, 566 (7th Cir. 1987).  Indeed, the court in Dziewior observed that the omission of plaintiff's name from the published minutes "raise[d] a factual issue."  Dziewior, 715 F. Supp. at 1424.  See also Melo v. Hafer, 1992 WL 396816, at *4 (E.D. Pa. Dec 22, 1992) (finding that defendant's "defense that plaintiffs were not identified by name [at a press conference] is not exculpatory" where state defamation law did not require a

12

plaintiff to be named and where, <u>inter</u> <u>alia</u>, some of the plaintiffs said "they became 'instant celebrities' in their home towns").

The plaintiff here has specifically alleged that the June 24, 1996, minutes did effectively convey her identity to others. She has presented the deposition testimony of a co-worker stating that "shortly after Class Day" the co-worker "heard that [plaintiff] was fired for attending Class Day." (Miller Dep. at 10.) Another co-worker testified: "My understanding was that [plaintiff] was fired from the school because she attended the assembly and put the hours on her time card, that's what I was told by people." (Swain Dep. at 26.)[6] Plaintiff has raised a genuine issue of material fact regarding publication by the school board of the stigmatizing charge against her. Defendants are therefore not entitled to summary judgment.

Plaintiff also contends that Defendant Moccia published the stigmatizing charge against her when he disclosed the reason for her termination to the USPS. Defendants argue that this claim fails in light of <u>Siegert v. Gilley</u>, 500 U.S. 226 (1991), in which the Supreme Court held that an allegedly defamatory statement made by plaintiff's former supervisor in response to a

---

[6]It is unclear from Ms. Swain's testimony whether she heard these rumors before or after plaintiff disclosed the charge against her at the July 22, 1996, school board meeting. Ms. Swain was only asked (at least in the portion of the deposition before the court) whether she had an understanding about plaintiff's employment status by the time she had received a letter dated September 9, 1996. Ms. Miller's testimony, however, suggests that rumors had started "shortly after Class Day," (Miller Dep. at 10), <u>i.e.</u>, possibly before July 22, 1996.

13

request for information from a subsequent employer did not implicate a constitutionally-protected liberty interest. Siegert, however, is distinguishable. The fatal flaw in Siegert was that "[t]he alleged defamation was not uttered incident to the termination of Siegert's employment by the hospital, since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later." Siegert, 500 U.S. at 234. Here the defamatory charge was made in the course of terminating plaintiff's employment at Alton Central School and was then repeated by Defendant Moccia to the USPS. Defendants have cited no authority holding that a defamatory statement made in the course of termination and later repeated is not "published" for purposes of implicating a constitutionally-protected liberty interest. Cf. Campanelli v. Bockrath, 100 F.3d 1476, 1482 (9th Cir. 1996) (noting distinction between "post-termination statements" and "statements made concurrently with the termination . . . [and] published in a newspaper at a later time"); Brant v. Board of Coop. Educ. Serv., 820 F.2d 41, 45 (2d Cir. 1987) (rejecting "argu[ment] that because of the lapse of time between Brandt's termination and any future disclosure of the sexual allegations, the imposition of the stigma would not occur 'within the course of termination,'" where "the charges were placed in the employee's file during the course of his termination"). Accordingly, defendants' claim to summary judgment on this ground also fails.

14

Defendants next argue that they are entitled to summary judgment on plaintiff's substantive due process claim because their actions do not shock the conscience. The court agrees that defendants' alleged actions do not rise to the level of "conscience-shocking," under any reasonable interpretation one might give to the phrase. See Chakrabarti v. Cohen, 31 F.3d 1, 7 (1st Cir. 1994) (negative personnel actions leading to nonrenewal of psychiatrist's clinical privileges at hospital did not shock the conscience). However, the First Circuit has recognized that substantive due process may be violated in either of two ways: "(1) the government actor deprived the plaintiff of an identified interest in life, liberty or property protected by the Fifth [or Fourteenth] Amendment, or (2) the government actor's conduct 'shocks the conscience.'" Aversa v. United States, 99 F.3d 1200, 1215 (1st Cir. 1996); see also Brown v. Hot, Sexy and Safer Prods., Inc., 68 F.3d 525, 531 (1st Cir. 1995). Plaintiff argues that because she has a protected liberty interest, she may proceed under the first theory.

The course plaintiff seeks to take was left open by the court in Newman v. Commonwealth of Massachusetts, 884 F.2d 19 (1st Cir. 1989). There, in deciding whether the defendants were entitled to qualified immunity, the court noted that "at the time defendants acted it was clearly established in our circuit that school authorities who make an arbitrary and capricious decision significantly affecting a tenured teacher's employment status are liable for a substantive due process violation." Id. at 25

15

(footnote omitted).  The cases relied upon in Newman found that the decision to not renew teacher contracts would be arbitrary and capricious "if the stated reason for the action was 'trivial, or is unrelated to the educational process . . . or is wholly unsupported by a basis in fact.'" Id. at 24 (quoting McEnteggart v. Cataldo, 451 F.2d 1109, 1111 (1st Cir. 1971)); see also Drown v. Portsmouth School Dist., 451 F.2d 1106, 1108 (1st Cir. 1971).

The court in Newman noted that it was analyzing plaintiff's substantive due process rights on the assumption that they were triggered by her property interest in her employment.  Newman, 884 F.2d at 24 n.5.  It recognized, however, that plaintiff might also have a protected liberty interest based on the defamatory charge made against her, and stated: "Assuming, without deciding, that this liberty interest would be protected by a clearly established substantive due process right, we have been given no reason to treat the property and liberty interests differently in deciding whether defendants are entitled to qualified immunity." Id.  Thus, Newman at least contemplated the protected interest plaintiff seeks to assert.

The District Court for the District of Puerto Rico found that the question left open in Newman was effectively resolved in Santiago de Castro v. Morales Medina, 943 F.2d 129 (1st Cir. 1991).  See McCann v. Ruiz, 802 F. Supp. 606, 614-15 n.4 (D.P.R. 1992).  In Santiago, the Court of Appeals rejected plaintiff's attempt to rely on Board of Regents of State Colleges v. Roth, 408 U.S. 564 (1972), a procedural due process case, to establish

16

a property interest in employment protected by substantive due process. The court noted that "in the realm of substantive due process it is only when some basic and fundamental principle has been transgressed that the constitutional line has been crossed." Id. at 131 (internal quotation marks omitted). Relying on Santiago, the court in McCann held that "an individual's liberty interest in his reputation does not reflect a fundamental constitutional right and is therefore not protected under the substantive component of the due process clause." McCann, 802 F. Supp. at 614.

In 1996, however, the First Circuit entertained a substantive due process claim based on an asserted liberty interest under Paul v. Davis, 424 U.S. 693 (1976). See Aversa, 99 F.2d at 1215. Although the court held that plaintiff could not establish a constitutional claim under Siegert because the adverse employment action he suffered was at the hands of a third party, it appeared to assume that substantive due process protection would be available if a protected liberty interest could be shown. Id. at 1215-16.

A number of other circuits have held that occupational deprivations potentially implicate only procedural, not substantive, due process. See e.g., Singleton v. Cecil, 1999 WL 301623 at *7 (8th Cir. April 27, 1999); Zorzi v. County of Putnam, 30 F.3d 885, 895 (7th Cir 1994)(noting that "[o]ccupational liberty . . . is not protected by substantive due process"); McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994)

17

(holding that employee with state-created property interest in employment is entitled only to procedural, not substantive, due process). The Supreme Court, however, has not expressly addressed the issue, and this court must follow First Circuit precedent which, as it now stands, seems to recognize (albeit hardly unarguably) substantive due process rights in employment-related liberty. See Aversa, 99 F.3d at 1215; Newman, 884 F.2d at 25. So, plaintiff may proceed, for now, with her substantive due process claim so long as she can prove a protected liberty interest in her employment. Defendants are therefore not entitled to summary judgment as to this claim, at least not at this stage of the litigation.

Defendants next argue that they are entitled to summary judgment on plaintiff's claims for defamation and intentional interference with contractual relations because a conditional privilege exists, entitling former employer responding to a potential employer's request for a reference. Defendants also argue that plaintiff consented to the publication of the allegedly defamatory statement to the USPS. As the court finds the latter argument dispositive, the former need not be considered.

The general rule, as stated in the Restatement (Second) of Torts § 583 (1977), is that "the consent of another to the publication of defamatory matter concerning him is a complete

18

defense to his action for defamation."[7]  The New Hampshire

Supreme Court has apparently not addressed the issue of consent

to a defamatory statement.  It has however, relied upon the

Restatement as authority in other defamation-law matters.  See,

e.g., Independent Mechanical Contractors, Inc. v. Gordon T. Burke

& Sons, Inc., 138 N.H. 110, 118 (1993); Duchesnaye v. Munro

Enter., Inc., 125 N.H. 244, 249, 250, 252, 253 (1984).  The New

Hampshire Supreme Court, if presented with the issue, would

likely adopt the consent defense.  See e.g. Cox v. Nasche, 70

F.3d 1030, 1031-32, 1032 n.3 (9th Cir. 1995) (finding that Alaska

would apply the absolute privilege of consent where, inter alia,

Alaska courts have turned to the Restatement on matters of

defamation law).

Plaintiff's application for employment with the USPS, which

she signed and dated December 11, 1996,[8] asked "May the US Postal

Service ask your present employer about your character,

qualifications, and employment record?  A 'No' will not affect

your consideration for employment opportunities."  (Ex. 1 to

Pl.'s Dep.)  Plaintiff checked the box marked yes.  Plaintiff

knew at the time she signed her employment application that she

had been terminated for the stated reason of falsifying her time

card.  She therefore was fully aware that her employer would

_____

[7]This defense is also referred to as an absolute privilege.
See Restatement (Second) Torts § 583 cmt. f ("The privilege
conferred by the consent of the person about whom the defamatory
matter is published is absolute.").

[8]Plaintiff dated the application again on January 14, 1997,
after making changes to it.  (Pl.'s Dep. at 17-18.)

19

convey the same reason for termination set out in the public record in response to any inquiry from the USPS. <u>Cf</u>. Restatement (Second) Torts § 583 cmt. d ("It is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication or that he has reason to know that it may be defamatory."). In addition, Defendant Moccia's allegedly defamatory statements were not unsolicited, but were made in response to the USPS's approved request for information.[9]

Because plaintiff consented in advance to Defendant Moccia's statements to the USPS, her defamation claim based on those statements must fail. <u>See e.g.</u> <u>Gengler v. Phelps</u>, 589 P.2d 1056, 1057 (N.M. Ct. App. 1978) (finding statements of former employer solicited by potential employer were absolutely privileged where plaintiff's written employment application asked "When may inquiry be made of your employer?," to which plaintiff answered "Anytime"); <u>Patane v. Broadmoar Hotel, Inc.</u>, 708 P.2d 473, 476 (Colo. Ct. App. 1985) (holding that statement to employment counselor, who "had plaintiff's written consent to make inquiry of her work history," was absolutely privileged); <u>see</u> <u>also</u> <u>Cox</u>, 70 F.3d 1030 (no liability where plaintiff executed written

[9]The investigative request form Defendant Moccia completed was from the United States Office of Personnel Management ("OPM"). Defendants have not argued that the OPM and USPS are different parties for defamation purposes. Defendants have also not suggested that the second telephone conversation between Defendant Moccia and a USPS representative, initiated by Defendant Moccia, was not in response to the USPS's request for information.

authorization to contact former employers and a release from liability); Bagwell v. Peninsula Reg'l Med. Ctr., 665 A.2d 297 (Md. Ct. Spec. App. 1995) (same); Baker v. Bhajan, 871 P.2d 374 (N.M. 1994) (same); Smith v. Holley, 827 S.W.2d 433 (Tex. App. 1992) (same). Defendants are entitled to summary judgment as to plaintiff's defamation claims based on Defendant Moccia's statements to the USPS.

Plaintiff's intentional interference with contractual relations claim must fail for the same reasons. Under New Hampshire law, a plaintiff seeking to recover for this tort must prove the following: "(1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." Demetracopoulos v. Wilson, 138 N.H. 371 (1994)(internal quotation marks omitted). "An action for interference with contractual relations cannot succeed, however, where the defendant's actions were justified under the circumstances." Bricker v. Crane, 118 N.H. 249, 252 (1978), overruled on other grounds, Eastern Marine Const. Corp. v. First Southern Leasing, 129 N.H. 270 (1987). Plaintiff's consent to the publication of information about her work history to the USPS justified Defendant Moccia in providing that information at the USPS's request. See Bagwell, 665 A.2d at 314-15 (appellant could not make prima facie case of intentional interference with business relations where he consented to disclosure of

21

information in his employment files). Defendants are entitled to summary judgment on plaintiff's claim for intentional interference with contractual relations.

These conclusions do not, however, dispose of plaintiff's entire defamation claim, as she alleges that she was also defamed by the publication of the school board's June 24, 1996, minutes. As suggested previously, under general defamation law, "[i]t is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended." Restatement (Second) Torts § 564 cmt. b. The court assumes that the New Hampshire Supreme Court, which does not appear to have addressed this issue, would apply an identical principle. As plaintiff has raised a genuine issue of material fact regarding whether a reasonable person would understand the school board minutes to refer to her, defendants are not entitled to summary judgment on the basis that it was plaintiff who disclosed that she was the staff member who had been terminated.

The court also rejects defendants' argument that plaintiff is a public figure who is required to prove actual malice in a defamation action. Public figure status is generally acquired in one of the following ways: "(1) when persons assume roles of especial prominence in the affairs of society, perhaps by occupying positions of persuasive power and influence, or (2) when persons thrust themselves to the forefront of particular

22

public controversies in order to influence the resolution of the issues involved." Pendleton v. City of Haverhill, 156 F.3d 57, 67 (1st Cir. 1998) (internal quotation marks and brackets omitted).

Defendants note that plaintiff served as a member of the Alton School Board from 1983 to 1991 and has served as moderator for the Alton School District meeting since 1995. The subject matter of this suit does not relate to those offices, however. The court finds that plaintiff's status as a current or former "elected official" in the Town of Alton does not make her a public figure for purposes of this lawsuit, the subject matter of which relates exclusively to her role as school employee. See Snitowsky v. NBC Subsidiary (WMAQ-TV), 696 N.E.2d 761, 767 (Ill. App. Ct.), cert. denied, 705 N.E.2d 450 (1998) (school special education teacher who had been a member of the local school council was not a public figure for purposes of lawsuit seeking to recover for defamatory statements charging her with serious misconduct in the classroom).

Defendants also argue that by publicly discussing her termination, plaintiff "put[] her qualifications into the public realm in a manner suggesting she was trying to influence public opinion, . . . [and thereby] became a public figure for purposes of discussion on her fitness for her job." (Def.'s Br. at 15.) Plaintiff's public discussion, however, occurred after the allegedly defamatory charges were made against her. "[O]ne does not become a public figure merely by defending oneself publicly

23

against accusations." Pendleton, 156 F.2d at 68. Plaintiff is not a public figure for purposes of this lawsuit.

Defendants also argue that they are entitled to summary judgment on plaintiff's "Right-to-Know Law" claims, because she did not have any right to a "meeting," as required by N.H. Rev. Stat. Ann. § 91-A:3, II(a) (Supp. 1998). That statute provides:

> Only the following matters shall be considered or acted upon in nonpublic session:
> (a) The dismissal, promotion or compensation of any public employee or the disciplining of such employee, or the investigation of any charges against him, unless the employee affected (1) has a right to a meeting and (2) requests that the meeting be open, in which case the request shall be granted.

In Johnson v. Nash, 135 N.H. 534 (1992), the New Hampshire Supreme Court interpreted a prior version of this provision[10] as requiring notice to the employee. The court held:

> Because it would be unreasonable to expect public employees to attend every public meeting in which their termination could conceivably be considered, . . . under RSA 91-A:3. II(a), a governmental body may not move to go into executive session for the purpose of considering the termination of a public employee unless it has previously put that employee on notice that such a motion would be made.

Defendants argue that plaintiff was not entitled to notice that her termination would be considered at the June 24, 1996, school board meeting because she enjoyed neither a state law nor constitutional right to a hearing. Defendants therefore appear to concede that a constitutional right to a hearing (or public

---

[10]The statute in force at the time Johnson was decided did not require a right to a meeting. See Johnson, 135 N.H. at 537. Thus, the ruling in Johnson originally applied to all public employees.

24

meeting) would be sufficient to trigger a notice requirement. See <u>McManus v. Ceshire County, New Hampshire</u>, CV-96-223-SD, slip op. at 2 (D.N.H. January 7, 1998) (holding that "the phrase 'a right to a meeting' refers to either a statutory or a constitutional right" and that therefore a tenured public employee who had a right to a pre-termination hearing under <u>Cleveland Bd. Of Educ. v. Loudermill</u>, 470 U.S. 532 (1985), was entitled to notice under N.H. Rev. Stat. Ann. § 91-A:3, II(a)). Since all defendants are not entitled to summary judgment on plaintiff's constitutional claims, however, they cannot prevail on this argument.

Defendants also argue that New Hampshire's Right-to-Know Law does not authorize a private action for damages. Although the Right-to-Know statute does not explicitly provide a damages remedy, the New Hampshire courts appear to have implied one. In <u>Johnson</u>, the New Hampshire Supreme Court affirmed a superior court order that "reinstated the plaintiff to his post with back pay and awarded him attorney fees pursuant to RSA 91-A:8, I." <u>Johnson</u>, 135 N.H. at 535. The court therefore rejects defendants' argument. See <u>McManus v. Cheshire County, New Hampshire</u>, CV-96-223-SD, slip op. at 13 (D.N.H. Nov. 25, 1997) (finding that <u>Johnson</u> "indicates that compensatory damages are recoverable, even though the statute does not specifically provide for such damages").

Defendants' final argument is that Defendant Moccia is entitled to qualified immunity on plaintiff's constitutional

25

claims and statutory immunity on her state law claims.  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Comparing this case to Siegert, Defendant Moccia contends that he, like the defendant in that case, is entitled to qualified immunity.  But in Siegert, no constitutional violation occurred.  The Court noted that "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."  Siegert, 500 U.S. at 232.  It then held that there had been no constitutional deprivation because the allegedly defamatory statements were not made in connection with petitioner's termination.  Id. at 233.

Plaintiff's case is distinguishable from Siegert on this ground alone, and defendants have failed to demonstrate the absence of any constitutional violation in their motion for summary judgment.  Thus, Defendant Moccia cannot succeed in averting liability on the basis that there has been no constitutional violation.

The constitutional rights plaintiff seeks to vindicate have been recognized since the Supreme Court, in Board of Regents v.

26

Roth, 408 U.S. at 573, noted that if in failing to rehire a teacher the State made "any charge against him that might seriously damage his standing and associations in his community," due process would have required "an opportunity to refute the charge . . . ." Subsequent Supreme Court cases, all predating Defendant Moccia's challenged actions, refined the protected interest to require that the stigmatizing charge (1) be made in the course of or incident to the employee's termination, Siegert, 500 U.S. at 234; Paul, 424 U.S. at 710, and (2) be publicly disclosed, Bishop, 426 U.S. at 348.[11] The law regarding plaintiff's asserted liberty interest was clearly established at the time of Defendant Moccia's conduct, and, if the facts pled are true, he should have known his conduct would violate plaintiff's clearly established constitutional rights. See Harlow, 457 U.S. at 818-19 ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.").

Defendant Moccia also asserts immunity as to plaintiff's state law claims under N.H. Rev. Stat. Ann. § 31:104 (Supp. 1998), which provides that no school superintendent "shall be held liable for civil damages for any vote, resolution or decision made by said person acting in his official capacity in

---

[11]In Codd v. Velger, 429 U.S. 624, 627 (1977), the Supreme Court held that in order to state a claim under Roth and Bishop the plaintiff must also allege that the stigmatizing charge against him is "substantially false."

27

good faith and within the scope of his authority." The parties do not develop their arguments on this issue in their briefs.

The court notes that the only state law claims remaining are defamation with respect to the June 24, 1996, school board minutes, and violation of the Right-to-Know Law. Plaintiff has not questioned Defendant Moccia's good faith with respect to violation of the Right-to-Know Law. To the extent Defendant Moccia had a duty to notify plaintiff that her termination would be considered at the June 24, 1996, meeting, he has testified that he had no prior knowledge that the matter would come up at the meeting, and no contrary relevant evidence has been brought to the court's attention. (Moccia Dep. at 13.) Thus, plaintiff has failed to raise a genuine issue of material fact as to Defendant Moccia's statutory immunity on this issue.

The allegedly defamatory minutes are somewhat more difficult, as plaintiff contends that attendees of the meeting knew that other staff members also recorded their time at the assembly, and thus, their actions against her could be said to have been taken in bad faith. It appears, however, that Defendant Moccia's only connection to the allegedly defamatory statement is that he recorded it in the minutes of the meeting. (Moccia Dep. at 67, 71.) Plaintiff has not argued (and cannot reasonably argue) that Defendant Moccia had any discretion not to record the school board's decision[12] or that he acted in bad

---

[12]N.H. Rev. Stat. Ann. § 91-A:3, III provides, in part: [m]inutes and decisions reached in nonpublic session shall be publicly disclosed within 72 hours of the

28

faith in wording the minutes as he did. Plaintiff has failed to raise a genuine issue of material fact as to Defendant Moccia's lack of good faith in merely recording the decision of the school board. Thus, Defendant Moccia is plainly immune from liability as to plaintiff's remaining state law claims.

Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Counts II and IV are dismissed entirely, Counts III and VI are dismissed as to Defendant Moccia. Plaintiff's defamation claim (Count III) fails to the extent it is based on Defendant Moccia's statements to the USPS, and plaintiff is not a public figure for purposes of Count III. Count V is dismissed voluntarily.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 24, 1999

cc:   Charles G. Douglas, III, Esq.
      Diane M. Gorrow, Esq.

---

meeting, unless, by recorded vote of ⅔ of the members present, it is determined that divulgence of the information likely would affect adversely the reputation of any person other than a member of the body or agency itself or render the proposed action ineffective.